## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:20-CV-698

| | | |
|---|---|---|
| SPENCER BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| GREYSTAR REAL ESTATE PARTNERS, | ) | |
| LLC, GREYSTAR MANAGEMENT | ) | **JURY TRIAL DEMANDED** |
| SERVICES, L.P., MORGAN BOND | ) | |
| CHARLOTTE, LLC, KIMBERLY | ) | |
| UPTON, & STEPHANIE HOVIS. | ) | |
| | ) | |
| Defendants. | ) | |

## I. INTRODUCTION

1. Spencer Brown ("Plaintiff" or "Brown") began working for Greystar Real Estate Partners, LLC and Greystar Management Services, L.P. (collectively, "Greystar") as a security guard tasked with patrolling one of the apartment complexes they managed, known as Inspire Southpark. Morgan Bond Charlotte, LLC ("Morgan Bond") owned the property and is the entity with which Brown had a lease.

2. After being harassed by a resident of the complex numerous times and reporting it to his supervisors, Brown was threatened with termination if he continued to pursue the complaint.

3. Without anything being done to resolve the situation, Brown again complained to his supervisor, Kimberly Upton ("Upton"), only to have her follow up on her threat to terminate him on November 6, 2018, due to alleged "performance issues." Upton has since

1

acknowledged that this was not actually her reason for firing Brown. Instead, she admits that she fired him because of his complaints against his harasser. Brown then complained about his retaliatory termination to Regional Property Manager Jody Rimmer ("Rimmer") and Senior Director of Real Estate Stephanie Hovis ("Hovis," collectively with Greystar, Morgan Bond, and Upton, "Defendants"). Hovis threatened Brown further that she would make false and derogatory statements about Brown to the Charlotte-Mecklenburg Police Department ("CMPD") in an effort to get him fired from that job, too, if he continued to press his harassment and retaliation claims. Brown left Defendants' property in response to this threat.

4. Brown now turns to this Court to be made whole for his harms and losses. Brown brings this action against the Defendants for violations of Title VII of the Civil Rights Act of 1964 (Count I), violations of 42 U.S.C. § 1981 (Count II), breach of contract (Count III), tortious interference with contract (Count IV), and tortious interference with prospective economic advantage (Count V).

## II. PARTIES, JURISDICTION AND VENUE

5. Plaintiff resides in Mecklenburg County, North Carolina.

6. Greystar Real Estate Partners, LLC is a limited liability company, with its principal office in Wilmington, Delaware. Its registered agent is the Corporation Trust Company and their registered address at Corporation Trust Center 1209 Orange Street, Wilmington Delaware 19801.

7. Greystar Management Services, L.P. is a limited partnership, with its principal office in 18 Broadstreet, Charleston South Carolina, with its registered office and mailing address at 160 Mine Lake Ste 200 Court, Raleigh, NC 26716.

8. Morgan Bond is a Delaware LLC, with its principal office in Charlotte, North Carolina and its registered and mailing address at 251 Little Falls Drive, Wilmington, DE 19808.

9. Kimberly Upton is a resident of Mecklenburg County who resides at 1310 Ivey Dr., Charlotte, North Carolina 28205.

10. Stephanie Hovis is a resident of Mecklenburg County who resides at 2355 Crockett Park Pl., Charlotte, North Carolina 28203.

11. Venue is proper in the Charlotte Division of the Western District of North Carolina because: (a) Defendants' unlawful employment practices were committed in Mecklenburg County, North Carolina; (b) Plaintiff would have worked in Mecklenburg County, North Carolina but for Defendants' unlawful employment practices; (c) Defendants reside in Mecklenburg County, North Carolina because they are subject to the Court's personal jurisdiction there in light of the business they transact in Mecklenburg County and elsewhere in the Western District of North Carolina; and (d) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Mecklenburg County, North Carolina and elsewhere in the Western District of North Carolina.

### III. FACTUAL STATEMENT

12. Brown initially began working for Greystar on January 30, 2018. He was hired as a security guard for Greystar's Inspire Southpark ("Inspire") location which had been under construction at the time.

13. In or around late February 2018, Brown had been introduced to Emily Noel along with a few other residents. During this initial meeting, one of Emily's friends mentioned to

Brown that Emily "had a thing for black guys" and that Emily thought he was attractive. Brown responded that he had no interest in a personal or romantic relationship with Emily.

14. A second incident occurred on or around June 9, 2018, when Brown, friends, and coworkers were at the Inspire pool. Emily interjected herself into Brown's gathering. As she spoke with the group, Emily told Brown that she believed that he was "blessed," as she gestured toward his crotch. Brown interpreted this as a reference to stereotypes about African-American males' genitalia. She further said that she wanted to "bless" Brown, which he took to be a sexual innuendo. Brown ignored her advance.

15. Emily's behavior escalated drastically on or around October 5, 2018, during the Inspire grand opening party. Brown had been in attendance and socializing with friends and neighbors when Emily made her way to his group.

16. After numerous other harassing interactions with Emily, Brown tried to distance himself from Emily. At one point in this party, Brown went to the men's restroom. He entered alone and was surprised to see that Emily had followed him into the restroom.

17. Shocked, Brown told her to leave immediately and that she could not be in the men's restroom. Emily responded that she didn't "give a fuck" and told Brown she wanted to remain. Brown attempted to exit the restroom but Emily quickly blocked his path and pushed him away with her arms.

18. Emily remained and proceeded to prop her leg on the door, with her foot holding the door closed, while exposing herself to Brown, since she was wearing a skirt. All the while, another resident that Brown had been speaking with at the party began to bang on the door after hearing the commotion, but Emily refused to let him in.

4

19. Emily proceeded to say to Brown that if he tried to leave again, she would scream and accuse him of rape. Emily then harassed Brown about being in an interracial relationship. Emily then weaponized her own race as part of her threat, expressly stating that she was white and calling the police. The clear implication was that the police would believe her word over his because she was white and he black. After what seemed like an eternity, Emily relented and allowed Brown to exit the restroom.

20. Brown returned to his group and explained what just happened to friends and residents. While leaving, Brown overheard Emily yelling profanities at him.

21. The following day, on October 6, 2018, Brown had been on the clock and walked into the front office. Much to his dismay, he saw Emily standing in the lobby and attempted to maintain his distance from her. While waiting to be seen by his supervisor, he noticed Emily leering at him while making sustained growling noises.

22. Shortly after the bathroom incident, Brown reported everything involving Emily to two of his supervisors, Kim Upton and Jordan Howell. He informed them that a resident had sexually and racially harassed him at work.

23. Rather than take his complaints seriously, Upton told Brown that his complaint was causing a "conflict of interest" and went so far as to say that she would fire him in response if he pressed his complaint. Upton left the room to speak with "legal," and upon her return asked Brown to submit a report on the incidents.

24. Brown did as instructed and wrote up a formal complaint on October 24, 2018, in an email addressed to Upton and Howell.

25. Shortly after this email, Upton made good on her threat to terminate Brown, and did so on November 6, 2018. Upton cited performance issues as her reason for terminating Brown, despite never having previously raised any issues with his performance. In addition to losing his job, Brown's discounted leasing contract was also terminated, effective December 1, 2018.

26. Upton has since admitted that she lied—acknowledging that neither Brown's performance nor any late rent payment were her reasons for firing him. Instead, she admitted that she fired him because of his complaints against his harasser and her belief that he could not remain in his job if he obtained a restraining order against Emily. Further, she stated that if one of them had to go, it would be him because Emily was a full-paying tenant. She also acknowledged that she did not investigate Brown's allegations of sex-based and race-based discrimination. She did not care about the truth of such important civil rights matters. By her own admission, only the higher-paying tenant mattered to Upton.

27. Brown then complained about his retaliatory termination to Regional Property Manager Jody Rimmer and Senior Director of Real Estate Stephanie Hovis. Hovis threatened Brown further that she would make false and derogatory statements about Brown to the Charlotte-Mecklenburg Police Department ("CMPD") in an effort to get him fired from that job, too, if he continued to press his harassment and retaliation claims. Brown left Defendants' property in response to this threat.

28. On February 21, 2019, Brown filed a charge of discrimination with the Equal Employment Opportunity Commission against Greystar.

29. The Equal Employment Opportunity Commission issued right-to-sue letters on September 16, 2020.

## IV. LEGAL CLAIMS

### Count I
*(Violation of Title VII of the Civil Rights Act of 1964)*
*Against Greystar*

30. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

31. Greystar has had more than fifteen (15) employees at all relevant times and otherwise meets all requirements to be deemed an employer as defined in 42 U.S.C. § 2000e(b) subject to the prohibitions of Title VII.

32. Plaintiff was an employee of Greystar at all relevant times to this lawsuit. In their termination notice, Greystar spelled out that Brown's job required him to:

A. Be on call for disturbances and calls as needed;

B. Walk the community at regular intervals, specifically patrolling the amenities, common areas, management office, walkways, and pools;

C. Complete a nightly report daily to document his patrols and supply this report to the Community Manager;

D. Respondent to courtesy related requests as appropriate and contact law enforcement for additional backup and/or assistance when needed;

E. File Courtesy Patrol Nightly Reports with the Community Manager to report disturbances either answered or unanswered, stray animals, suspicious persons, etc.

7

Brown was to notice the Community Manager immediately of any altercations on the community that involve injury, property damage, resident complaints, or media attention.

F. Inspect lights and report any outages on the daily report given to the Community Manager;

G. Attend community functions and meetings as requested;

H. Assist the Community Manager in handling any resident problems when requested;

I. Notify the Community Manager of any unplanned absences and arrange to have duties performed during such absences;

J. Maintain a courteous, visible presence among the residents; and

K. Additional duties upon request.

33. Brown's term of employment was for one year, but subject to renewal each year just like his lease agreement. Therefore, the expected duration of the relationship was indefinite, but at least one year.

34. Brown had no opportunity for profit or loss in his job for Greystar.

35. Greystar carved out for themselves a substantial degree of control over the manner in which Brown's work was performed. While they claim that Brown had no set schedule, Greystar has alleged some type of performance failure from the claim that he was allegedly unavailable to Ms. Upton from 7:15 a.m. until 9:52 a.m. on July 21, 2018. Likewise, Greystar has alleged that Brown failed to do his job by being off property for a couple of hours on July 30, 2018. Greystar claims that Brown failed to do his job by not answering a phone call from the Community Manager on August 4, 2018. Greystar similarly claims that Brown failed to

do his job by being unavailable to take an alleged eight calls from Ms. Upton on October 31, 2018. Greystar also claims that he failed to do his job on October 31, 2018, by not responding to Ms. Upton's calls about burglaries until after CMPD had handled the matter. These allegations by Greystar are untrue, but revelatory of the degree of control Greystar expected to exercise control over Brown, and the expansive availability they demanded of him in his job.

36. Brown dealt with the issue on July 21 himself, just not in the manner that Ms. Upton thought preferable. Thus, her discipline for this episode demonstrates the degree of control Greystar exercised over the manner in which Brown completed his duties.

37. Ms. Upton cancelled her request for assistance on July 30 just as soon as she made it, telling Brown "Nevermind! It's not them." Brown then reported that he was off property for a few hours. Greystar's discipline over this statement shows that Greystar did require him to be on property at certain times, even when there was no security need to address.

38. The same is true of the alleged "trespasser" situation in which Brown explained to Greystar that he could not prosecute anyone for trespassing in the absence of a "no trespassing" sign. Greystar still wanted him to take specific actions as part of its effort to control the manner in which Brown did his job.

39. Brown did respond to the first October 31 incident (the alleged eight phone calls). However, Greystar was unhappy with the way Brown responded to the issue. Brown wanted to investigate suspected underage drinking. Greystar did not want that to happen and obstructed Brown's ability to do his job in the manner he thought appropriate.

40. Greystar agreed that Brown could not respond to the burglary call unless dispatched there by CMPD. Greystar's discipline of Brown for not doing so is revelatory of the degree of control they sought to exercise over the time, place, and manner of which Brown completed his job—even in contravention of their own agreed-upon parameters.

41. Kimberly Upton signed an agreement on Greystar's behalf with the Charlotte-Mecklenburg Police Department entitled, "Rules Governing Apartment Security **Employment**." *See* Exhibit A (emphasis added). Through this contract, Ms. Upton agreed that Inspire was a prospective employer for Brown and that the job at Inspire would be "secondary <u>employment</u>" to his job with CMPD (emphasis added). Upton agreed that Brown could not respond to a police call at Inspire when on duty with CMPD unless dispatched to the call by CMPD. Per this agreement, Upton "requested a courtesy officer for security duties at our apartment community" and requested that "Spencer Brown [] be our courtesy officer here." She promised that he would "receive $887.50 monthly as compensation for his services." *See* Exhibit B. Brown did not have the ability to subcontract this job to another officer, pay that officer less than $887.50 monthly, and keep the profit. No. Greystar required that it be Brown and required him to do the job in the manner Greystar saw fit. Brown was Greystar's employee.

42. There were no special skills required to complete the job for Greystar. While Brown did possess special skills in order to be a sworn police officer for the Charlotte-Mecklenburg Police Department, Greystar's job required no additional skills to perform this job on top of those required to be a police officer.

43. The job required no capital investment from Brown whatsoever.

44. Title VII prohibits discrimination on the basis of race, including by way of a hostile work environment based on race.

45. Title VII prohibits discrimination on the basis of sex, including by way of a hostile work environment based on sex.

46. Greystar violated Title VII by maintaining a hostile work environment based on race and sex. Plaintiff was subjected to an increasingly severe dose of race-based and sex-based harassment while on the job. This grew more and more serious throughout the year and reached a zenith when Emily cornered him in the bathroom, exposed herself to him, threatened to report him for rape if he did not accede to her demands, harassed him about his interracial relationship, and weaponized her own race as a reason she would be believed over him in the event she falsely claimed rape.

47. Brown reported this race-based and sex-based hostile work environment to Greystar, expressly citing both race and sex as impermissible motives behind the harassment he faced.

48. Title VII prohibits retaliation for complaining about race discrimination.

49. Title VII prohibits retaliation for complaining about sex discrimination.

50. Defendant violated VII by terminating his employment in retaliation for his race discrimination and gender discrimination complaints.

51. As an actual, proximate, and foreseeable consequence of Greystar's conduct, Plaintiff has suffered lost income, loss of housing, diminution in expected earning, emotional distress, anxiety, humiliation, expenses, reputational harm, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

52. Greystar's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. Greystar's officers, directors, and managers participated in and condoned this malicious, willful, wanton, and reckless conduct alleged above. As a result of Greystar's conduct, Plaintiff is entitled to recover punitive damages.

**Count II**
*(Violation of 42 U.S.C. § 1981)*
*Against Greystar and Morgan Bond*

53. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

54. The foregoing allegations against Defendants' constitute a deprivation of Plaintiff's right to make and enforce contracts on the same terms enjoyed by white persons, and otherwise continue discriminatory conduct on the basis of race against Plaintiff, in violations of 42 U.S.C. § 1981.

55. Greystar and Morgan Bond violated Section 1981 by maintaining a hostile environment based on race. Plaintiff was subjected to an increasingly severe dose of race-based harassment while on Greystar and Morgan Bond's property. This grew more and more serious throughout the year and reached a zenith when Emily cornered him in the bathroom, exposed herself to him, threatened to report him for rape if he did not accede to her demands, harassed him about his interracial relationship, and weaponized her own race as a reason she would be believed over him in the event she falsely claimed rape.

56. Brown reported this race-based hostile work environment to Greystar, expressly citing race as one impermissible motive behind the harassment he faced.

57. Greystar violated Section 1981 by maintaining a hostile work environment based on race. Brown complained about this race-based discrimination in October 2018.

58. Greystar violated Section 1981 by terminating Plaintiff's employment in retaliation for his race discrimination complaints.

59. Greystar claims to have hired Brown as an independent contractor rather than an employee. In the alternative to the above, Brown alleges that Greystar ended its "contract" with Brown in retaliation for his race discrimination complaints.

60. Greystar and Morgan Bond violated Section 1981 by terminating Plaintiff's rental contract in retaliation for his race discrimination complaints.

61. Greystar and Morgan Bond violated Section 1981 by increasing Plaintiff's rent in retaliation for his race discrimination complaints.

62. Greystar was Morgan Bond's agent at all times relevant to this Complaint and is responsible for the actions it took on Morgan Bond's behalf through express authorization, implied authorization, actual authority, apparent authority, and ratification.

63. As an actual, proximate, and foreseeable consequence of Greystar's and Morgan Bond's conduct, Plaintiff has suffered lost income, diminution in expected earnings, emotional distress, anxiety, humiliation, expenses, reputational harm, housing costs, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

64. Greystar's and Morgan Bond's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. Greystar's and Morgan Bond's officers, directors, and managers participated in and condoned the malicious,

13

willful, wanton, and reckless conduct alleged above. As a result of Greystar's and Morgan Bond's conduct, Plaintiff is entitled to recover punitive damages.

**Count III**
*(Breach of Contract)*
*Against Morgan Bond*

65. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

66. A valid contract existed between Brown and Morgan Bond in the form of Brown's Apartment Lease Contract dated January 21, 2018, and Lease Addendum for Rent Concession or Other Rent Discount dated January 21, 2018.

67. Morgan Bond breached the contract when it cancelled Brown's $887.50 monthly rent concession effective December 1, 2018. This was before the end of the contract, scheduled for January 31, 2019. Brown was not permitted to enjoy the benefit of his bargain. Brown was denied the ability to continue his rent at the discounted level for December and January.

68. Morgan Bond is responsible for Greystar, Upton, and Hovis's actions because they were Morgan Bond's agents at the time of their tortious actions against Brown. Morgan Bond is responsible on the basis of express authorization, implied authorization, actual authority, apparent authority, and ratification.

69. As an actual, proximate, and foreseeable consequence of Morgan Bond's breach, Plaintiff has suffered damages in the form of money damages, lost income, diminution in expected earnings, emotional distress, anxiety, humiliation, expenses, reputational harm, housing costs, and other damages and is entitled to recover expectation damages, compensatory damages, and consequential damages in an amount to be determined at trial.

14

## Count IV
### *(Tortious Interference with Contract)*
### *Against Greystar, Hovis, & Upton*

70. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

71. A valid contract existed between Brown and Morgan Bond in the form of Brown's Apartment Lease Contract dated January 21, 2018, and Lease Addendum for Rent Concession or Other Rent Discount dated January 21, 2018. Greystar, Upton, and Hovis all knew about this valid contract between Brown and Morgan Bond. Greystar, Upton, and Hovis intentionally induced Morgan Bond's nonperformance of the contract by cancelling Brown's $887.50 monthly rent concession before the end of the contract—scheduled for January 31, 2019. Greystar, Upton, and Hovis intentionally so induced Morgan Bond's nonperformance without justification.

72. Kim Upton terminated Brown's Apartment Lease Contract dated January 21, 2018, and Lease Addendum for Rent Concession or Other Rent Discount dated January 21, 2018, before it was scheduled to end in January 2019. She did so because Brown reported sexual and racial harassment from a fellow resident.

73. Stephanie Hovis ratified Kim Upton's actions and also communicated to Brown that Greystar would be terminating Brown's Apartment Lease Contract dated January 21, 2018, and Lease Addendum for Rent Concession or Other Rent Discount dated January 21, 2018 before it was scheduled to end in January 2019. Hovis went even further by threatening Brown that she would also tortiously interfere with his contract with the Charlotte-Mecklenburg Police Department if he pursued his harassment and retaliation claims. Hovis

15

did all this because Brown reported sexual and racial harassment from a fellow resident and then complained about his retaliatory termination.

74. Greystar is responsible for Upton and Hovis's tortious interference with Brown and Morgan Bond's contract. Upton and Hovis were Greystar's agents at the time of their tortious actions against Brown. Greystar is responsible on the basis of respondeat superior, express authorization, implied authorization, actual authority, apparent authority, and ratification.

75. To the extent any defendant is held to have a qualified privilege to interfere with the above contractual relations, such privilege is overcome because Greystar, Upton, and Hovis all had improper, personal, and legally malicious motives. Greystar, Upton, and Hovis acted with legal malice by doing a wrongful act and exceeding their legal right and authority in order to prevent the continuation of the contract between Brown and Morgan Bond. Greystar, Upton, and Hovis acted out of personal retaliatory animus, personal ill-will, and personal hostility rather than any corporate interest of Morgan Bond's.

76. Greystar, Upton, and Hovis all exceeded their authority by their above actions and thereby forfeit any privilege they may be held to have once possessed.

77. Greystar, Upton, and Hovis all acted for a reason not reasonably related to the protection of a legitimate business interest of Morgan Bond's.

78. As an actual, proximate, and foreseeable consequence of Greystar, Upton, and Hovis's conduct, Plaintiff has suffered damages in the form of money damages, lost income, diminution in expected earnings, emotional distress, anxiety, humiliation, expenses, reputational harm, housing costs, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

79. Greystar, Upton, and Hovis's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. Greystar's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above. As a result of Greystar, Upton, and Hovis's conduct, Plaintiff is entitled to recover punitive damages.

### Count V
#### *(Tortious Interference with Prospective Economic Advantage)*
#### *Against Greystar, Hovis, & Upton*

80. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

81. A valid contract existed between Brown and Morgan Bond in the form of Brown's Apartment Lease Contract dated January 21, 2018, and Lease Addendum for Rent Concession or Other Rent Discount dated January 21, 2018.

82. As with all other residents of Inspire Southpark, Morgan Bond would have renewed this contract with Brown in January 2019 for another year—resulting in another year of discounted rent for Brown. This would have continued indefinitely in 2020, 2021, 2022, 2023, 2024, 2025, 2026, 2027, 2028, 2029, 2030, etc.

83. Greystar, Upton, and Hovis all knew about this valid contract between Brown and Morgan Bond and the natural progression of renewals each year that would have taken place in 2019, 2020, 2021, 2022, 2023, 2024, 2025, 2026, 2027, 2028, 2029, 2030, etc., but for Greystar, Upton, and Hovis' tortious interference.

84. Greystar, Upton, and Hovis intentionally induced Morgan Bond to refrain from entering into Apartment Lease Contracts and Lease Addendum for Rent Concession or Other

17

Rent Discounts in 2019, 2020, 2021, 2022, 2023, 2024, 2025, 2026, 2027, 2028, 2029, 2030, etc., by ending Brown's rent concession in November 2018 and preventing him from obtaining it again thereafter. Greystar, Upton, and Hovis intentionally so induced Morgan Bond's nonperformance without justification.

85. Without Greystar, Upton, and Hovis's tortious interference, Morgan Bond and Brown would have entered into continued Apartment Lease Contracts and Lease Addendum for Rent Concession or Other Rent Discounts in 2019, 2020, 2021, 2022, 2023, 2024, 2025, 2026, 2027, 2028, 2029, 2030, etc.

86. Kim Upton ended Brown's rent concession in November 2018 and prevented him from obtaining it again thereafter. She did so because Brown reported sexual and racial harassment from a fellow resident.

87. Stephanie Hovis ratified Kim Upton's actions and also communicated to Brown that Greystar would be ending Brown's rent concession in November 2018 and preventing him from obtaining it again thereafter. Hovis went even further by threatening Brown that she would also tortiously interfere with his contract with the Charlotte-Mecklenburg Police Department if he pursued his harassment and retaliation claims. Hovis did all this because Brown reported sexual and racial harassment from a fellow resident and then complained about his retaliatory termination.

88. Greystar is responsible for Upton and Hovis's tortious interference with Brown and Morgan Bond's expected future contracts. Upton and Hovis were Greystar's agents at the time of their tortious actions against Brown. Greystar is responsible on the basis of

respondeat superior, express authorization, implied authorization, actual authority, apparent authority, and ratification.

89. To the extent any defendant is held to have a qualified privilege to interfere with the above contractual relations, such privilege is overcome because Greystar, Upton, and Hovis all had improper, personal, and legally malicious motives. Greystar, Upton, and Hovis acted with legal malice by doing a wrongful act and exceeding their legal right and authority in order to prevent the execution of these future contracts between Brown and Morgan Bond. Greystar, Upton, and Hovis acted out of personal retaliatory animus, personal ill-will, and personal hostility rather than any corporate interest of Morgan Bond's.

90. Greystar, Upton, and Hovis all exceeded their authority by their above actions and thereby forfeit any privilege they may be held to have once possessed.

91. Greystar, Upton, and Hovis all acted for a reason not reasonably related to the protection of a legitimate business interest of Morgan Bond's.

92. As an actual, proximate, and foreseeable consequence of Greystar, Upton, and Hovis's conduct, Plaintiff has suffered damages in the form of money damages, lost income, diminution in expected earnings, emotional distress, anxiety, humiliation, expenses, reputational harm, housing costs, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

93. Greystar, Upton, and Hovis's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. Greystar's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and

reckless conduct alleged above. As a result of Greystar, Upton, and Hovis's conduct, Plaintiff is entitled to recover punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff prays the Court to:

1. Enter a judgment against Defendants and order the Defendants to pay Plaintiff expectation damages, compensatory damages, and consequential damages in an amount to be determined at trial;

2. Award Plaintiff punitive damages pursuant to 42 U.S.C. § 1981a *et seq*., and 42 U.S.C. § 1981 *et seq*.;

3. Award Plaintiff all reasonable costs and attorney's fees incurred in connection with this action;

4. Award Plaintiff punitive damages under North Carolina State law;

5. Award Plaintiff such other and further equitable relief as the Court deems appropriate under the circumstances; and

6. Grant Plaintiff a trial of this matter by a jury.

This is the 15th day of December, 2020

/s/ Kevin P. Murphy
Sean F. Herrmann
North Carolina Bar No. 44453
Kevin P. Murphy
North Carolina Bar No. 41467
Herrmann & Murphy, PLLC
1712 Euclid Avenue
Charlotte, North Carolina 28203
Phone: 704-940-6399
Fax: 704-940-6407
Email: kevin@herrmannmurphy.com
Email: sean@herrmannmurphy.com

*Attorneys for Plaintiff*